**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CASE NO. 1:14-CR-422-SCJ** |
| | ) | |
| **SAMUEL PEREZ** | ) | |

### SENTENCING MEMORANDUM

COMES NOW Samuel Perez, by and through undersigned counsel, and hereby files this Sentencing Memorandum to assist the Court in imposing a reasonable sentence in this matter.

### SENTENCING PROCEDURES AND STANDARDS

The United States Supreme Court has declared the United States Sentencing Guidelines to be advisory and not binding upon the Sentencing Judge. *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). In the post-*Booker* era, the Supreme Court in *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed. 2d 445 (2007) instructs the district courts on the procedural approach to sentencing, and the appellate standard to be applied to the sentencing court's determination. The Supreme Court in *Gall* observed:

> As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however.

Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. See id., [Rita v. United States, 551 U.S. 338(2007), 127 S.Ct. at 2456.] He must make an individualized assessment based on the facts presented. If he decides that an outside – Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing. Id., 127 S.Ct. at 2456.

Gall v. United States, supra 552 U.S. at 49-51; 128 S.Ct. at 596, 597 (emphasis added).

According to the Presentence Report, the Base Offense level for wire fraud under 18 U.S.C. §1343 is 7, and the Specific Offense Characteristic relating to the loss amount increases that offense level by 18 to a level 25. Though disputed, the Presentence Report also applies a 2 level sentencing enhancement for the alleged use of "sophisticated means." This adjustment brings the offense level to 27. Finally, the Report reduces this offense level by 3 levels under USSG 3E1.1 (a) and (b) for

2

acceptance of responsibility for a Total Offense Level of 24.

Under the terms of the plea agreement, there are no departures from the Guidelines that are literally applicable in the instant case, and either party may argue for a variance from the Sentencing Guideline range. In this regard, the Government has agreed to recommend a one-level downward variance based upon the defendant's actions in expeditiously waiving indictment and entering a plea of guilty, thus conserving judicial and prosecutorial resources.

As noted in Gall, this is where the Court begins its consideration of an appropriate sentence – one that is not greater than necessary to comply with the purposes of the sentencing statutes. Using the factors contained in 18 U.S.C. §3553 (a), the Court must make an individualized assessment of the facts presented to determine the appropriate sentence to be imposed. Gall, supra. Here, Sam Perez submits that his extensive and consistent year-long effort to "make right" the damage he caused by preserving, growing and transitioning his company's business operations over to the victim, Facteon, were so unusual and extraordinary as to warrant a downward variance under 18 U.S.C. § 3553.

## SOPHISTICATED MEANS ENHANCEMENT

In this case, the Government seeks and the Presentence Report includes an enhancement in the defendant's sentence of employing "sophisticated means." Defendant Perez contends that this enhancement is not appropriate in the instant case for the following reasons.

Federal Sentencing Guideline 2B1.1(b)(10)(c) provides a two-level increase for offenses involving sophisticated means, which is defined by comment as follows:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means. [U.S.S.G. § 2B1.1, cmt. 8(b).]

Courts throughout the country have noted that the language requiring "especially complex" or "especially intricate" schemes is not without moment. Whether a scheme is sophisticated must be viewed in light of the fraudulent conduct and differentiated, by assessing the intricacy or planning of the conduct, from similar offenses conducted by different defendants. United States v. Hance, 501 F.3d 900, 909 (8th Cir. 2007). In other words, "[i]n determining whether to apply the enhancement to a

mail fraud case, courts have asked whether the defendant's mail fraud scheme, 'when viewed as a whole, was notably more intricate than that of a garden-variety mail fraud scheme.'" United States v. Cole, 296 F. App'x 195, 197 (2d Cir. 2008)(citing Hance, 501 F.3d at 909-910; United States v. Lewis, 93 F.3d 1075, 1083 (2d Cir. 1996)).

In United States v. Hulse, 989 F. Supp. 2d 1224 (M.D. Ala. 2013), the defendants were involved in a scheme by which they falsely obtained loan money by representing Hulse to be wealthy, and then used the proceeds for unauthorized purposes.  The United States sought application of the sophisticated means enhancement because (1) defendants falsely represented Hulse to be wealthy; (2) the offense spanned over jurisdictions; (3) the offense involved fraudulent documents; (4) the funds obtained were used for fraudulent purpose; (5) one defendant provided screenshots from the Bloomberg system; and (6) another defendant lent credibility to the scheme as he was an attorney.  The court found that this did not warrant a sophisticated means enhancement.  The court examined the extent to which the fraud must be "especially" complex or intricate:

> The guideline is clear: It is not enough for the means used in a scheme to be "complex" or "intricate"; rather, the means must be "especially" so. The definition of "especially" includes "exceptionally" and "particularly."  Webster's Third New International Dictionary (1986). That is,

the level of complexity or intricacy must
set that particular scheme apart from
ordinary schemes, and even ordinarily
complex or intricate schemes.

The reasoning behind this heightened
requirement is obvious. The essence of fraud
involves deceit or deception. *See* Black's
Law Dictionary (9th ed.2009) (fraud involves
a "knowing misrepresentation of the truth or
concealment of a material fact"). More
likely than not, *some* complexity will always
be required to carry out such deceit. If the
only requirement to apply this enhancement
were *some* complexity, nearly every fraud
would qualify. Therefore, to assure that
this guideline does not result in a
defendant being punished twice for fraud,
the drafters of the guidelines restricted
the enhancement to only those schemes that
are *especially* complex or intricate.
[Id. at 1226-27 (emphasis added).]

In United States v. Brown, 877 F. Supp. 2d 736 (D. Minn.
2012), the court found that the presentence report properly did
not enhance the sentence for sophisticated means. The defendant
hatched an investment fraud scheme, soliciting funds from people
and using the proceeds to pay for personal debts. In
determining not to apply the enhancement, the court noted that
the defendant "did not create fictitious entities, corporate
shells, or offshore financial accounts for Fund X assets, but
rather opened readily identifiable accounts at local banks." Id.
at 752.

Like those seen in Hulse and Brown, Sam Perez's actions do
not amount to the especially complex or intricate conduct

necessary to warrant a sophisticated means enhancement. His business, CompCare, was of course utilized to accomplish the fraud at issue by submitting false invoices and receiving payment. These invoices were later "verified" by Perez using false email addresses. Of course, this type of factoring fraud necessarily involves some level of complexity. Defendant submits, however, that his deception was the very essence of the fraud to obtain advance payments from the factoring company, thus amounting only to "garden-variety" factoring fraud.

The reality is that obtaining advanced payments on false invoices is simply not possible without some mechanism for invoice verification. The use of false email addresses to accomplish this step is far less complex than the Government suggests. One can register a custom email and domain name for as little as $5.00 per month using common websites such as www.GoDaddy.com. To create a signature block to further a false identity takes a matter of minutes. What may have required some level of sophistication in the past is certainly made more accessible through the use of modern technology.

Additionally, Sam Perez did not incorporate entities in foreign jurisdictions or create offshore financial accounts to obfuscate the fraud at issue. CompCare provides the legitimate service of occupational medical testing programs for other companies; Perez's connection with the company is clear, and

7

lacks the complex corporate structuring seen in other "sophisticated means" cases.

Without minimizing the seriousness of the defendant's conduct, the deception at issue is nothing more than a "garden variety" factoring fraud case. Those steps taken to accomplish the fraud do not rise to the "especially complex" level warranting a sentencing enhancement for sophisticated means. To apply the enhancement in this case would additionally punish Sam Perez for what is, in essence, factoring fraud.

## THE DEFENDANT'S BACKGROUND

Samuel Perez is a 38 year old man who immigrated to the United States with his parents and siblings when he was an infant. He became a naturalized citizen of the United States in 1990. He lives with his wife of 17 years and their two children, Lillian (10) and Sebastian (6) who is a "special needs" child. Sabby suffers from Trisomy 8 Mosaicism, a chromosomal abnormality that causes physical abnormalities and developmental problems, as well as Agenesis of the Corpus Callosum, a brain malformation. Sabby also has an abnormal kidney and heart that require specialized doctor visits. Sam cares deeply about his family and is extremely worried about how they will manage while he is incarcerated. Erica, his wife, has a limited employment history at mostly "entry level" jobs, and has no particular job skills by education or training.

Samuel Perez has always provided for his family, has a steady employment history and has a reputation as a hard-working man.   He is presently employed and has never been on unemployment. Sam Perez began working in the field of occupational medical testing in 2001 for Allied Medical Services and was successful in developing many vendors and clients for that company.  In 2009, when Allied filed for bankruptcy, Perez, along with seven laid-off employees of Allied, began to operate his own occupational medical testing business – CompCare.  While he knew much about how to arrange for and manage occupational medical testing services for businesses requiring their employees to be tested, Sam Perez had never run his own business before. He was not, in 2009, experienced enough to gauge how profitable his business could be and the costs that he would incur in providing these testing services over time.

As the letters addressed to the Court indicate, Sam Perez is a good motivator of people, he lends a hand to those in need and has supported charities in his community. (See Exhibit 1). His conduct reveals that he is extremely remorseful, is deeply concerned for his family and remains committed to righting his wrong. At the same time, however, the defendant has personally struggled with the stresses of dealing with his crime both before and after he confessed to Tom Nort. Unfortunately, he

sought refuge in his alcohol consumption – an issue for which he has sought help and will have to deal with going forward.

## NATURE AND CHARACTER OF THE OFFENSE

As previously noted, Sam Perez had never operated his own business before CompCare, and, after operating the business for a time, he experienced severe cash flow problems as the business was, in fact, severely undercapitalized. He resorted to factoring and the submission of false invoices to generate sufficient cash to continue to run his business. This misguided and futile effort was born of a Pollyanna belief that CompCare would grow fast enough to pay back the false invoices and be on sound financial footing. Once the sad reality took hold, however, Sam Perez believed he was in too deep, and he was too scared to stop it. As Facteon let the volume of CompCare's factored invoices grow, Sam made the hole become deeper and deeper.

Of the $42.7 million that Facteon paid out to CompCare for account receivable invoices, CompCare paid $45.3 million to Facteon, but received rebates after the invoices were paid in full. Facteon's loss on remaining unpaid invoices and fees was approximately $6.2 million dollars. As Sam Perez explained to Facteon's CEO, Tom Nort when he confessed his crime to him on October 3, 2013, the overwhelming majority of the funds obtained from Facteon were used to repay Facteon on previously factored

bogus receivables that were coming due. Sam Perez has acknowledged and the company records appear to confirm that he made personal use of approximately $500,000.00 of Facteon's funds over their four (4) year relationship. Perez also utilized a significant amount of Facteon funds to address CompCare's cash flow and business expense/debt issues. From all of these activities, Sam Perez found himself involved in an ever expanding spiral of debt that required the submission of more and more false invoices to meet the payment obligations on previous false invoices coming due. When the number and amount of CompCare's unpaid factored invoices that had aged over 90 days reached unacceptable levels, Facteon would no longer fund CompCare's invoices and CompCare's open invoices could not be repaid.[1]

## **EXTRAORDINARY ACCEPTANCE OF RESPONSIBILITY**

A downward variance may be appropriate under <u>Booker</u>, <u>supra</u>, even in cases where the Sentencing Guidelines ordinarily prohibit a departure. "When imposing a sentencing falling far outside of the Guidelines range, based on the § 3553(a) factors, an extraordinary reduction must be supported by extraordinary

---

[1] In paragraph 21 of the pre-sentence report, it is alleged that a separate loan to CompCare by Facteon of approximately $184,000.00 went unpaid. Sam Perez believes that the loan was repaid by deductions taken by Facteon from amounts to be rebated back to CompCare. In any event, the amount involved with this loan does not change the offense level set forth in section 2B1.1 of the Guidelines.

circumstances." United States v. Clay, 483 F.3d 739, 746 (11th Cir. 2007)(citing United States v. McVay, 447 F.3d 1348, 1357 (11th Cir. 2006)).

In Gall v. United States, 552 U.S. 38 (2007), the facts involved post-offense conduct, and the decision upholds proper consideration of this conduct in determining the appropriateness of a variance. Other circuit courts, too, have permitted similar variances specifically when the defendant demonstrates extraordinary acceptance of responsibility. See, e.g., United States v. Severino, 454 F.3d 206 (3d Cir. 2006); United States v. Gatewood, 438 F.3d 894, 897 (8th Cir. 2006); United States v. Lake, 419 F.3d 111 (2d Cir. 2005); United States v. Milne, 384 F.Supp.2d 1309 (E.D. Wis. 2005).

Furthermore, the Supreme Court in Gall, supra, stated as follows:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.
> [Gall 52 U.S. at 52-53 (2007)(internal citations omitted).]

Defendant submits that a downward variance is warranted in this case due to his extraordinary acceptance of responsibility, as indicated below.

On October 3, 2013, Facteon's CEO, Tom Nort, and Sam Perez met in Nort's office in Atlanta to discuss the state of CompCare's accounts receivable that had been factored through Facteon. The two had spoken and met in the weeks before on this subject, and they explored a payment plan and a settlement proposal made by Perez. During the October 3rd meeting, which lasted over an hour, Perez fully confessed his crime to Nort, including the details of how he committed it and an overview of what Perez did with the money that had been paid to CompCare over the years. Unbeknownst to Perez, the entire meeting was videotaped.

Although this was the right thing to do and started a long process of assisting Facteon, it must be noted that Perez did have other options. In the weeks and months leading up to this meeting, Sam Perez, recognizing the end was approaching, could have decided to continue to factor invoices, personally withdraw funds paid by Facteon, personally take receipts from legitimate customers and then drain the CompCare bank accounts, shut down CompCare's business (leaving almost two dozen employees unemployed) and make efforts to hide money and force authorities to track him down. Instead, Sam Perez maintained his Company's performance at a high level and continued his efforts to expand CompCare's customer base and services. His purpose was clear – to maintain the performance and reputation of CompCare as a

quality provider of occupational medical testing programs for companies nationwide. CompCare was the only asset he could offer Facteon to right the wrong he had done.

During his October 3rd meeting with Tom Nort, Sam Perez repeatedly told Nort of his intentions:

> "And I'm here to make good on this and take care of this and I'm standing here because I want to make this right." ***

> "And I am the vehicle for you to get your money back and that's why I'm here, that's why I've . . . made myself available . . . and like I said to you, I am not hiding." ***

> "I haven't disappeared. I mean, at the end of the day, I haven't disappeared. I'm still here and I've been sending you money. I'm running the company. . ."

> "I can make it right. I am the driving force of this company and I can make it right." *** "I can, like I told you, I'll record all my sales to you, I'll show you where every nickel and dollar is being sent and how we're paying you back and how customers can pay you back, I will do that. I will work for you until we satisfy ever nickel on this. I'm not going to open CompCare 2, I haven't taken one client and moved it to another company. I haven't done any of that." ***

Also during this meeting, Sam Perez sat with Nort and showed him, through an internet connection, the growth in CompCare's business and his efforts to land still more customers. Perez told Nort "we can set you up on how you can

log into our system, look at sales, look at Quickbooks, look at everything being paid out, everything being done…."  In fact, in a persistent effort to right his wrong, Sam Perez did exactly that – he opened up all of CompCare's books, records and bank accounts to Facteon, its attorneys and its forensic accountants to reveal the criminal act he perpetrated on Facteon, but far more significantly, to show the income CompCare was producing and the revenue growth it had been experiencing over the past three years.

Later that month, Federal Grand Jury subpoenas were issued to at least one of CompCare's customers. This event could have also pushed Perez to take what he could and shut down. Instead, he spoke with Tom Nort regularly and continued to make payments to Facteon. During the balance of October and into early November, Sam Perez continued to operate CompCare, provided key employees with more responsibility to improve management, and made several marketing efforts to expand the Company's customer base.  From late September to mid-November, CompCare repaid Facteon over $84,000.00. (See Exhibit 2).

On November 11, 2013, Facteon filed a civil complaint in the U.S. District Court for the District of New Jersey naming CompCare, Perez and other individuals and entities as defendants in a suit to recover damages and obtain other relief.  The

filing of this Complaint was followed by extensive telephone conferences with Facteon's attorneys during which they were informed that Sam Perez had directed his counsel to cooperate with Facteon and to minimize its litigation costs. On November 22, 2013, Facteon filed a Motion for a Temporary Restraining Order with expedited discovery and access to CompCare's financial records. At the direction of Sam Perez, Facteon's counsel, Thomas Harty, Esq., was informed that CompCare would consent to the entry of the Temporary Restraining Order, and that CompCare agreed to permit Facteon's forensic accountant to have full access to its books and records. On November 26, 2013, just four days after Facteon's motion was filed, a Consent Temporary Restraining Order granting the requested relief was filed with the Court and plans were made for a meeting to implement its terms. (See Exhibit 3). Also, in late November, Sam Perez and Tom Nort engaged in direct telephone conversations to discuss their relationship going forward.

Almost immediately after consenting to the entry of the TRO, Sam Perez began to make the books and records of CompCare available to Facteon's forensic accounting team. They not only made initial inspections of CompCare's offices, but Sam Perez agreed to and began to implement on-line access for Facteon's forensic accountants, and also provided access to his personal

financial and bank records.  On December 16, 2013, Sam Perez participated in an extensive conference with Facteon's attorney and forensic accountants at which he answered numerous and detailed questions concerning the allegations in the Complaint and company the financial records. He provided Facteon with details concerning which CompCare records reflected the Facteon fraud as well as the legitimate income and expenses of CompCare's operation.  During that meeting, a number of aspects for the continued operation of CompCare were agreed to by all parties.  Thereafter, the forensic accountants were regularly interacting with Sam Perez to identify records and ascertain what they reflected in terms of the company's business operations.

All during the period of November and December, 2013, Sam Perez not only assisted Facteon and its accountant in obtaining and reviewing financial records, but also embarked on a vigorous marketing effort that resulted in five new customers executing new service contracts with CompCare. (See Exhibit 4).[2] In a further effort to help Facteon, its attorneys and its forensic accountants to better understand CompCare's legitimate business

---

[2] This exhibit contains the first and last page of several customer contracts with CompCare signed between November 12, 2013 and December 26, 2013. The financial details are set forth on the redacted pages and are omitted to maintain confidentiality for ComplyFirst.

operations, marketing efforts and profitability, Sam Perez prepared and developed a 13-page business plan for CompCare's operations heading into 2014 and beyond. (See Exhibit 5). This business plan acknowledged that although Sam Perez was the driving force behind the company, he was not going to continue to play a management role over the long term. The business plan also outlined how CompCare could continue to succeed without him and identified key CompCare personnel and customers he was targeting to hire CompCare.

With the onset of 2014, Sam Perez continued to conduct the day to day operations of CompCare and continued his efforts to develop new customers. During this time period, Facteon had concluded that CompCare, as then structured, was not sufficiently viable in the short run for it to be acquired as a going concern. Instead, Facteon directed that it be hired by CompCare as a broker to try to sell the business to a third party. Thereafter, Perez assisted Facteon in producing financial information and attending meetings and communicating extensively with Tom Nort and prospective buyers. At a lengthy mid-February meeting attended by Tom Nort, Ken Biddick, Facteon's accountant, and attorney, Harty, Sam Perez agreed to provide customer and contract information and continue to seek new customers. Sam also arranged for some of CompCare's current customers to pay

their legitimate CompCare invoices directly to Facteon to reduce what was owed.

On February 27th, Sam Perez and Tom Nort engaged in a telephone conference where they discussed the steps necessary to attract a third-party buyer.   Tom Nort expressed to Sam Perez that they needed to provide examples of gross profitability and how to package this information with full disclosure to prospective buyers.   Tom Nort and Sam Perez exchanged numerous emails between February through April regarding CompCare's business and financial information concerning its operations. (See Exhibit 6). A review of these emails reveals that Sam Perez, in addition to running CompCare, was working hard with accountants and others to provide information showing CompCare's revenue stream. He answered question after question presented to him to support the sale of company or its assets. (Cf. March 21st and 24th email exchanges).

On March 12, 2014, after Facteon had examined all of the CompCare data and its own data and determined the amount of the Facteon loss, Sam Perez consented to the entry of a Consent Judgment for Damages in favor of Facteon and against CompCare and Perez himself.   This Consent Judgment was signed and intentionally not filed by Facteon for approximately three months while efforts to sell CompCare continued. (See Exhibit

7). On March 21st, Sam Perez and Tom Nort again discussed CompCare's financial information and the need for a profit and loss statement to show prospective buyers. On March 26th, Sam Perez and Facteon's forensic accountant, Ken Biddick, engaged in an extensive telephone conference of over an hour, during which Sam Perez discussed all aspects of CompCare sales and the financial data it had to confirm it. Details of CompCare's operations and dealings with vendors providing testing services were also explored. Part of the objective of this call was to educate Biddick about business operations and also to find a better way to show the results of CompCare's sales.

On April 28th, Facteon's counsel forwarded an email regarding Tom Nort and forensic accountant Biddick meeting with Perez and his employees, stating "we really are not doing anything but figuring out how to handle assets going forward; what they will produce; how to operate, etc…. The email confirms the availability of CompCare records and employees to better permit Facteon to learn CompCare's occupational testing business. (See Exhibit 8). All during this time, Sam Perez continued to run the company day to day with complete transparency and is also increasing company sales all during this period of assisting Facteon. A March 2013 to March 2014

comparison showed CompCare sales had increased by about $100,000.00. (See Exhibit 9).

By May of 2014, Facteon gave further consideration to an alternative to selling CompCare as a going concern to a third party. Facteon intended to levy and foreclose on all of CompCare's assets and then sell them or have a new entity operate the business. Sam Perez continued to market CompCare at this time – attending an important trade show on May 18th to help recruit CR England, a prospective customer. He also began to regularly meet with the prospective manager/operators who may operate the company going forward.

On May 29th, a detailed Forbearance Agreement is executed that memorializes much of what had already been agreed to and implemented by Perez and Facteon, with an eye toward a more formal transition of CompCare management and operations. (See Exhibit 10). The agreement sets forth in some detail the extent CompCare and Perez's cooperation, see Paragraph 9 (a) through (d), although it cannot begin to describe the hours of work committed by Sam Perez to fulfill his commitment to Facteon. Paragraph 9 (b) further confirms Perez's cooperation. Thereafter, Sam Perez continued his efforts to smoothly transition CompCare new operators and managers selected by Facteon. In June, Sam's access to all CompCare bank accounts was

removed, and he continues to teach the operational aspects of the business to Tom Nort and Steven Howell, the anticipated and eventually the actual, new manager/CEO of what will be the new company – ComplyFirst. By the end of May, CompCare has repaid Facteon $347,486.00. (See Exhibit 11).

Sam's efforts continued throughout July and August, and the completion of the transfer of CompCare assets and the transition of company management is on the fast track. On August 8, 2014, a Foreclosure Agreement is executed by Perez and Facteon takes ownership and control of all of CompCare's assets. (See Exhibit 12). The consideration for the transfer of CompCare assets could not be determined at the time of the foreclosure, and the required analysis would have taken considerable time and delayed the transition. An amount of $100,000.00 was set forth in the Foreclosure documents.  On August 11th, ComplyFirst, the new entity owned by Facteon, entered into a Consulting Agreement with Sam Perez for his continued services to the new company. (See Exhibit 13).  Sam worked for the company for a short time thereafter.  Although Sam's formal role with the new business was essentially over, he nevertheless continued his efforts to make ComplyFirst successful. In September, Sam received a personal phone call from a person he used to deal with at a major lab company who described a problem that he was having

with ComplyFirst that would jeopardize the lab's service relationship with the new company. Sam Perez knew that the destruction of this relationship would have a catastrophic effect on ComplyFirst, and he notified Tom Nort about this vendor problem and explained how the resolution of the dispute with the lab was critical to the continued successful operation of the business.  As a result of his efforts, this crisis was averted. (See Exhibit 14). Even into late October 2014, Perez continued to support ComplyFirst, creating for Tom Nort an "industry-ese" description of the company's services and passing on a potential customer lead. (See Exhibit 14).

One year later, ComplyFirst continues to operate a successful business.  Although Perez is not able to access the company's financial records, in its April Chapter 11 bankruptcy filing, Facteon acknowledged that after only 8 months of operation, ComplyFirst is "beginning to make a profit." (See Exhibit 15).

While it is true that Sam Perez was not able to instantly restore Facteon 100% of what it lost by his actions, Perez did faithfully commit himself to doing everything in his power to pay Facteon back. He worked tirelessly to run the company, market its services while, at the same time, providing financial data, educating Facteon personnel on how the business operated,

and how it was and in the future could make a significant profit. His restorative conduct, which began before he confessed and has continued for almost a year, is so unusual as to take it out of the "heartland" of cases and provisions of the Sentencing Guidelines. This extraordinary acceptance of responsibility has provided a future recovery for Facteon, and it is submitted that it should also provide Perez a recovery of his future in the form of a term of incarceration that is less than that suggested under the Sentencing Guidelines. For all of these extraordinary efforts, a downward variance is warranted.

**RESTITUTION**

Because of the need for additional time to identify and hopefully resolve the restitution aspect of this sentencing, Counsel for the Government and the Defendant have agreed that the restitution portion of this sentencing should be postponed for ninety (90) days pursuant to 18 U.S.C. § 3664(d)(5). This section provides as follows:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an

24

amended restitution order. Such order may be
granted only upon a showing of good cause
for the failure to include such losses in
the initial claim for restitutionary relief.


Respectfully submitted,


*/s/ W. Carl Lietz III*
W. CARL LIETZ III
GA BAR #452080
Kish & Lietz, P.C.
225 Peachtree Street, N.E.
1700 South Tower
Atlanta, Georgia 30303
404-588-3991 (office)
404-588-3995 (fax)


*/s/ Robert S. Bonney, Jr.*
ROBERT S. BONNEY, JR.   *
NJ BAR #12361975
Davison, Eastman & Munoz, P.A.
100 Willow Brook Road
Suite 100
Freehold, New Jersey 07728
732-462-7170 (office)
732-462-8955 (fax)


*Motion for Pro Hac Vice admission pending

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing filing into this District's ECF System, which will automatically forward a copy to counsel of record in this matter.

Dated: This 20th day of August, 2015.

/s/ W. Carl Lietz III
W. CARL LIETZ III
GA BAR #452080
ATTORNEY FOR SAMUEL PEREZ


Kish & Lietz, P.C.
225 Peachtree Street, N.E.
1700 South Tower
Atlanta, Georgia 30303
404-588-3991 (office)
404-588-3995 (fax)

/s/ Robert S. Bonney, Jr.
ROBERT S. BONNEY, JR.
NJ BAR #12361975
ATTORNEY FOR SAMUEL PEREZ


Davison, Eastman & Munoz, P.A.
100 Willow Brook Road
Suite 100
Freehold, New Jersey 07728
732-462-7170 (office)
732-462-8955 (fax)